IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| JAVIER R BENAVIDES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| GEORGIA PUBLIC DEFENDER | ) | FILE No 2019CV326240 |
| COUNCIL, an official board | ) | |
| of the State of Georgia; | ) | |
| CHARLES BROWN, individually and | ) | |
| in his official capacity | ) | |
| WILLIAM MAXWELL, individually and | ) | |
| in his official capacities | ) | |
| PENNY HUNTER, individually and | ) | |
| In her official capacities | ) | |
| AMY ALLEN, individually and | ) | |
| In her official capacities | ) | |
| TYLER TURNER, individually and | ) | |
| In his official capacities | ) | |
| JANET ASH, individually and in | ) | |
| her official capacities | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

VERIFIED PLAINITIFF'S FIRST AMENDMENT
COMPLAINT AND ADDITIONAL COUNTS

COMES NOW JAVIER R BENAVIDES (Plaintiff) and hereby pursuant to

O.C.G.A 9-11-15(a), files timely this Verified Plaintiff's First Amendment

Complaint and Additional Counts and respectfully indicates to this

Honorable Court the following:

I.    PARTIES

1.

Plaintiff is a citizen of the State of Georgia domiciled at 1399

Brookmere Way, Cumming Georgia 30040.

2.

Defendant, the Georgia Public Defender Council, (Council), is a State Council composed of 15 members and created pursuant to O.C.G.A. § 17-12-3.

3.

For purposes of the Civil Rights Act, the Council is an employer who has more than 15 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Therefore, this Court has jurisdiction over this matter.

4.

Pursuant to O.C.G.A § 45-1-4(a)(1), the Council is an agency for purposes of the Georgia Whistleblower Act.

5.

The Council may be served with this Additional Counts and Amendment at its Central Office located at 104 Marietta St. NW No. 400, Atlanta, Georgia 30303.

6.

Charles Brown is an individual serving the Enotah Judicial Circuit as Public Defender for the Georgia Public Defender Council.  Brown may be served personally with process at 59 South Main Street, Suite C, Cleveland, Georgia 30528.

7.

Penny Hunter is an individual serving the Enotah Judicial Circuit as an Assistant Public Defender for the Georgia Public Defender Council. Hunter may be served personally with process at 59 South Main Street, Suite C, Cleveland, Georgia 30528.

8.

William Maxwell is an individual serving the Enotah Judicial Circuit as an Assistant Public Defender for the Georgia Public Defender Council.  Maxwell may be served personally with process at 59 South Main Street, Suite C, Cleveland, Georgia 30528.

9.

Amy Allen is an individual serving the Enotah Judicial Circuit as an Assistant Public Defender for the Georgia Public Defender Council.  Allen may be served personally with process at 59 South Main Street, Suite C, Cleveland, Georgia 30528.

10.

Tyler Turner is an individual serving the Enotah Judicial Circuit as an Investigator for the Georgia Public Defender Council.  Turner may be served personally with process at 59 South Main Street, Suite C, Cleveland, Georgia 30528.

11.

Janet Ash is an individual serving the Enotah Judicial Circuit as administrative employee for the Georgia Public Defender Council.  Ash may be served personally with process at 59 South Main Street, Suite C, Cleveland, Georgia 30528.

II.   CONDITION PRECEDENT

12.

To bring a claim under Title VII, plaintiffs must first exhaust the administrative remedies available to him by filing a charge of discrimination within 180 days of the alleged discrimination.  42 U.S.C. § 2000e-5(e)(1).

13.

Moreover, a party asserting a claim under Title VII may do so within 90 days after receiving a notice of right to sue on the claim from the Equal Employment Opportunity Commission (EEOC). U.S.C. § 2000e-5(f)(1).

14.

Plaintiff filed a complaint with the EEOC on August 7, 2019, alleging that Plaintiff was discriminated from May 17, 2019 until August 1, 2019.  Therefore, the complaint with the EEOC was filed within 180 days of any act of discrimination under Title VII.

15.

On September 25, 2019, the EEOC mailed to Plaintiff a Notice of Suit Rights, stating that Plaintiff's lawsuit must be filed within 90 days of the reception of same.  Therefore, Plaintiff files the present lawsuit timely. (Exhibit A).

III.   JURISDICTION AND VENUE

16.

Pursuant O.C.G.A. § 45-1-4(e)(1), superior courts have jurisdiction to enforce compliance with the Georgia Whistleblower Act.

17.

Plaintiffs are not required to file an ante litem notice to the Council under the Whistleblower Act, because the plain language of the Statute "demonstrates that applies only to damages, caused by negligence, not intentional acts such as retaliation." West v. City of Albany, 300 Ga. 743, 747 (2017).

18.

Superior courts have jurisdiction in all cases except as otherwise provided in the Constitution. GA. CONST. art. VI § IV para., I.

19.

This Court has jurisdiction over claims brought under 42 U.S.C.
Title VII, because the Supremacy Clause of the United States Constitution
provides state courts of concurrent jurisdiction for claims under federal
law, and a state may not discriminate citizen's rights under federal laws.
Collins v. Dep't of Transp., 208 Ga. App. 53, 55, 56 (1993).

20.

Venue is proper in the county where a defendant resides against who
substantial relief is prayed.  GA. CONST. art. VI § II para., III.

II.   FACTS

21.

The Council has an office in the Enotah Judicial Circuit (Office) in
which Mr. Charles Brown (Brown) acts as the Chief Public Defender.  The
Office has three Offices, one in White County, one in Lumpkin County and
another in Union County.

22.

The Office in White County has four attorneys serving Lumpkin and
White counties, Mr. William Maxwell, (Maxwell), Ms. Penny Hunter,
(Hunter), Ms. Amy Allen, (Allen) and Brown.

23.

During Plaintiff's employment, the Offices in White and Lumpkin
Counties had three administrative employees, Jackie Williams (Williams),
Janet Ash (Ash) and Tammy Belback (Belback); and, one investigator Mr.
Tyler Turner (Turner).  Belback works more often at the satellite Office
located in Lumpkin County, but occasionally collaborates in White County.

24.

During Plaintiff's employment, the Offices in Union and Towns Counties had two attorneys, Ms. Jodi Spiegel (Spiegel) and Ms. Katherine Robinson (Robinson). Spiegel acted as the Deputy Chief for the Office.

25.

Plaintiff is a 48-year-old man, Hispanic, Latino, and naturalized United States citizen, originally from Lima, Peru.

26.

In December 2018, Plaintiff graduated with a Juris Doctor degree at Florida State University (FSU).

27.

Plaintiff is a foreign attorney holding an active license to practice law in the Republic of Peru (Peru).

28.

On February 25 and 26, 2019, Plaintiff took the Georgia Bar Exam. The Exam's results were published on May 17, 2019.

29.

Around the last week of April, Brown interviewed Plaintiff for the position Assistant Public Defender I at the Office.  During the interview, Plaintiff indicated to Brown that Plaintiff had taken the February 2019 and that the results will be published on May 17, 2019.

30.

On May 16, 2019, Plaintiff was employed by Mr. Charles Brown, (Brown), Chief Public Defender for the Council in the Enotah Judicial Circuit Office with the purpose to work as an attorney in charge of the juvenile cases.

31.

Since Plaintiff did not possess yet a license to practice law, Brown hired Plaintiff as Paralegal 4.  (Exhibit B).

32.

On May 17, 2019, at approximately 11:00 am, Plaintiff was informed by the Georgia Bar of Admissions that Plaintiff had not passed the exam. Plaintiff notified Brown of his failure to pass the bar within two hours of receiving notification of his failure.

33.

Brown is a government official who enjoys qualified immunity and only attorney with authority to supervise, hire, terminate and receive complaints against employees at the Office.

34.

On May 17, after acquiring knowledge of Plaintiff's failure to pass the bar, Brown ratified Plaintiff's employment and assigned Plaintiff Mr. John Deacon's (Deacon) former cases. (Exhibit C).

35.

On or around May 22, 2019, after consulting with the Council's office in Atlanta, Brown ratified Plaintiff's employment.  As per Brown's indications, in the interim, Plaintiff would be trained and remained employed as a Paralegal 4. Plaintiff's employment was conditioned upon passing the July 2019 Georgia Bar. (Exhibit C).

36.

On October 25, 2019, Plaintiff met Brown's condition necessary to preserve his employment with the Council by passing the Georgia Bar Exam. (Exhibit D).

37.

As per Brown's instructions, Plaintiff's workload would consist on working John Deacon's former cases fully.  The court appearances relative to same will be conducted by staff attorneys.  (Exhibit C).

38.

Maxwell and Allen positions are Assistant Public Defender I; Hunter is Assistant Public Defender III and Brown is a Chief Public Defender.

39.

The employees working at the White County Office, Ash, Williams, Brown, Maxwell, Hunter and Allen are Caucasians.

40.

A public record request to the Council shows that, during Plaintiff's employment, a male Caucasian by the name Thayer James Kolbo was employed by the Council as Paralegal 4. (Exhibit E).

41.

During Plaintiff's employment, Robert Leone, a Caucasian, third-year law student, served an internship at the Office.

42.

Until May 20, Maxwell, Hunter, Allen and Plaintiff had similar amount of workload. (Exhibit C).

43.

On or around May 20, Hunter distributed Plaintiff's cases among Maxwell, Allen and herself, which resulted in no workload for Plaintiff.

44.

On or around May 27, Dawson came to the White County Office.  During a conversation with Turner and Plaintiff, Dawson ordered Turner to have Plaintiff interview potential clients at the jail.

45.

On or around June 5, Plaintiff asked Brown whether he had changed Plaintiff's workload, but Brown confirmed that he had not made any changes.

46.

On or about June 11, Plaintiff informed Brown about his concerns regarding seclusion and discrimination.  Brown, according to Plaintiff perception, reacted annoyed and ratified Hunter's distribution of Plaintiff's cases.

47.

As a result of the June 11 conversation, Plaintiff's workload was reduced to accompanying Brown to juvenile court.  Plaintiff was not even required to prepare for juvenile court cases because, according to Brown, juvenile court is a waste of time.

48.

During Plaintiff's employment with the Council, Plaintiff opposed persistently his lack of assignments by requesting projects, research, assignments from Brown, Maxwell, Hunter, Turner and Allen to no avail.

49.

During Plaintiff's employment, Brown, Maxwell, Hunter, Turner and Allen conspired and discriminated Plaintiff based on his national origin and/or his race.

50.

On or around June 19, Dawson came back to the White County Office. Upon realizing that Turner had not trained nor provided assignments to Plaintiff, Dawson asked Turner to train Plaintiff once again.

51.

On or around June 20, Plaintiff requested Brown a leave of absence to study for the Georgia Bar exam.  Brown stated that Plaintiff could take time off in July so long same would not interfere with Independence Day or the attorney's trip to Savannah, Georgia.

52.

As of the day of Plaintiff's termination, Turner had taken Plaintiff to jails only once, refused to provide any directives on how to determine who to interview and allowed Plaintiff to interview prospective clients only once.

53.

On or about June 24, Plaintiff drove at his own expense to the Union Office to meet Robinson.  Plaintiff also met Spiegel.  Plaintiff performed some research for both attorneys to their satisfaction. Plaintiff complaint several times with Robinson about his segregation, seclusion and discrimination at the Office.

54.

During the June 24 visit, Spiegel requested Plaintiff to conduct a research for a murder case, State v. Pate.  Spiegel wanted to know what specific acts of bad conduct by a murder's victim can be brought as evidence in a murder case.  This project was the only assignment in which Plaintiff worked during his employment.

55.

On or about July 9, 2019 at around 11:45 am, Plaintiff asked Brown to talk about his research on the Pate case.  Plaintiff wanted to ensure Plaintiff's conclusion by consulting to a senior attorney.  Plaintiff's conclusion was that specific acts of bad acts by a victim of murder could be introduced only as Defendant's knowledge.

56.

After reading documents brought by Plaintiff regarding specific bad acts by a victim of murder, Brown, without discussing Plaintiff's legal analysis, requested Plaintiff for the specific acts that would be introduced.  Plaintiff responded: "I don't know, I'm just working on the legal research."  Since the answer was not of Brown's satisfaction, Brown continued asking several times, louder and louder: What are you trying to prove?

57.

After asking several times regarding the specific acts that would be introduced and noticeably frustrated with Plaintiff, Brown stood up holding a letter opener while screaming: "who the fuck cares what you are thinking you just kill the son of a bitch."

58.

Brown willfully, maliciously, or with the intent to harm Plaintiff, placed Plaintiff in reasonable state of apprehension by making rapid vertical movements while holding the dull knife above his head down to his waistline.  Plaintiff was afraid that Brown would lose his grip of the dull of knife or that Brown would throw the dull knife at Plaintiff.

59.

Prior to the altercation of July 9th, 2019, Plaintiff had personal knowledge that radiation and chemotherapy treatment had caused Brown to lose sensitivity in his fingertips.

60.

According to Brown's Memorandum, Brown's state of mind during the incident was angry and upset.  (Exhibit C).

61.

During Brown's attack the pointy part of the dull knife was facing Plaintiff.  About 2 or 3 inches of the dull knife were sticking out of Brown's closed fist.

62.

The dull knife is a letter envelope, about 8 to 10 inches long of a silver color.

63.

After communicating to Brown of feeling uncomfortable with Brown's actions, Plaintiff retreated back to his Office in fear for his well-being.

64.

Brown, after yelling Plaintiff's name for or around three minutes and realizing that Plaintiff was not coming back, Brown, maliciously, willfully or with the intent to harm Plaintiff, stormed into Plaintiff's Office while using profanity in complete disarray.  Brown's tumultuous entry into Plaintiff's office placed Plaintiff in reasonable state of apprehension.

65.

Once in the Office, Brown, while standing a few inches away from Plaintiff, repeatedly said, completely out of control and yelling louder and louder: What are you trying to prove? What are you trying to prove?

66.

Plaintiff said: "I do not know what Jodi wants to bring in." Nonetheless, Plaintiff's attempts to calm Brown down were not of Brown's satisfaction.  Thus, Brown continued screaming louder and louder as Brown's frustration grew more and more.

67.

Brown maliciously, willfully or with the intent to harm Plaintiff, continued yelling and hitting Plaintiff's desk, saying: "This is not going to work, I am the boss here and nobody… nobody walks out of my Office." "I am the boss here and no one is above me."  Brown's yelling and hitting furniture placed Plaintiff in reasonable state of apprehension.

68.

After the incident, Plaintiff told Janet Ash and Jackie Williams that Brown's actions impact directly the efficiency of the Office since they create a negative and hostile environment. Ash attempted to excuse Brown's actions indicating that Brown's actions were not personal. Plaintiff responded: "What can be more personal than being attacked?"

69.

About 10 minutes after, Plaintiff communicated with his wife, Christine Benavides, Plaintiff's desire to press charges right away, but wife told Plaintiff to not file a formal charge right away because: (a) Plaintiff need to take the Georgia Bar in less than 15 days; and, (b) Plaintiff may be discharged in retaliation.

70.

A public record request resulted in no responsive records of disciplinary action against Plaintiff for insubordination or violation of the Council's employee's policies, as a result of the July 9th incident.

71.

Ash is Brown's former sister in law.  Ash is related to two of Brown's children, Ash is the Office Manager at the White County Office and Brown's confidant and assistant.  (Exhibit D).

72.

On July 10, 2019, Brown asked Plaintiff to come over to his Office. Brown apologized for his actions briefly and Plaintiff expressed to Brown his desire to report his conduct.  (Exhibit C).

73.

After that comment, Brown repeated, as Brown did in Plaintiff's Office, in a menacing tone, "no one is above me, if you disrespect me once again, you should consider not returning ever again."  (Exhibit C).

74.

Plaintiff understood those two expressions as a threat in case Plaintiff would pursue any legal action.

75.

A few minutes later, Plaintiff asked Ash for Human Resources phone number and contact, as well as the name of Brown's supervisor, but Ash failed to answer the questions. In fact, Plaintiff learned that Ms. Jimmonique Rodgers was Brown's supervisor after being terminated.

76.

On July 12, Plaintiff communicated Todd Dawson about the incident with Brown.  Tyler Turner was present.

77.

In the morning of July 12, Plaintiff told Allen about the incident. Williams was in the conversation.  Allen seemed to be empathic with Plaintiff's situation.

78.

Around 11:00 am, Brown went to the courtroom to inform the employees who were observing a hearing that, Brown had been diagnosed with cancer. Furthermore, Brown indicated that Brown's condition was extremely serious. Brown exited the courtroom for the emergency room in tears.

79.

Under the assumption that Brown was temporarily on a medical leave of absence, Plaintiff asked Dawson about Plaintiff's leave of absence to study for the Georgia Bar.  Dawson indicated Plaintiff to ask Spiegel.

80.

Spiegel authorized Plaintiff's leave of absence.  Nonetheless, Plaintiff sent an email to Ash to ensure that Spiegel had the authority to grant the leave.  Ash indicated that Spiegel had not authority and that Brown was still in charge. Therefore, the leave of absence had not been granted. (Exhibit I).

81.

According to Brown's Memorandum of August 1st, Brown was diagnosed with cancer on July 12th, 2019.   (Exhibit C).

82.

Due to not having a phone number to call nor contact, Plaintiff called the Council's headquarters to no avail because no one answers the phone nor there is an option to communicate with someone in Human Resources.

83.

On July 15, Plaintiff considered filing a criminal case with the White County Sheriff's Office, but Plaintiff needed to retake the Georgia Bar on July 30 and 31.  Thus, Plaintiff decided to file charges at his return on August 1, 2019.

84.

On August 1, 2019, upon returning for his leave, Brown, willfully, maliciously, or with the intent to harm, terminated Plaintiff's

employment.  (Exhibit F).  During the conversation, Plaintiff told Brown that he was discharged in retaliation.

85.

In a Memorandum hand delivered to Plaintiff, Brown states that the termination was due to: (a) his failure to pass the bar; (b) conduct that led to Plaintiff's requesting a leave of absence; and (c) failure to "apparently" address a legal research.  Brown also indicates in the document that the hiring of Plaintiff did not relief the attorney's workload.  (Exhibit C).

86.

However, Plaintiff's workload was assigned and/or delegated to him on May 17, after Brown found out about Plaintiff's failure to pass the bar (Exhibit C); (b) Brown authorized personally Plaintiff's leave of absence on July 16 (Exhibit G); (c) Plaintiff was numerous times congratulated for the great research he performed by the attorney in charge of the case, Jodi Spiegel, for whom the research was made (Exhibit H); and, (d) for the most part, Plaintiff was the first one to arrive and last one to leave and he had requested numerous times to Maxwell, Allen, Hunter and Brown for work to no avail.

87.

On August 1, 2019, Plaintiff called Ms. Melanie Johnson-Devlin (Johnson) to inform her of his unlawful termination in retaliation for being assaulted by Mr. Brown.  During the conversation, Plaintiff indicated to Johnson that Plaintiff was discharged unlawfully in retaliation.

88.

Ms. Johnson-Devlin asked Plaintiff to gather all documents and information to prove his allegations.  However, while Plaintiff was in the process of gathering the information and documents, Ms. Johnson-Devlin sent an email to Plaintiff stating that Mr. Brown had authority to hire and terminate employee's employment at the Enotah Judicial Circuit Office. (Exhibit I).

89.

After receiving Ms. Johnson-Devlin's email supporting Brown's decision, Plaintiff sent a new email asking whether that was the Council's last decision.  The email was never responded and therefore interpreted by Plaintiff as a ratification of Brown's unlawful termination.

COUNT I
VIOLATION OF TITLE VII,
NATIONAL ORIGIN DISCRIMINATION

90.

This cause of action is against the Council under 42 U.S.C.S § 2000e-2(a)(1), and Brown under 42 U.S.C.S § 1983 in his official and individual capacities for discriminating against Plaintiff because of his national origin.  As well as against, Hunter, Maxwell, Allen and Turner for conspiring against Plaintiff.

91.

Paragraphs 1 through 89 are re-alleged as if set forth verbatim herein.

92.

Pursuant to Title VII of 42 U.S.C.S § 2000e-2(a)(1), employers are prohibited from making employment or personnel decisions, affecting the terms, conditions and privileges of an individual based upon his or her national origin.

93.

Plaintiff is a male Hispanic of Peruvian origin whom possesses the requisite qualifications and skills to be retained as an employee of the Council.  Plaintiff holds a Juris Doctor, pass the July 2019 bar, speaks Spanish and he is a foreign attorney.

94.

On May 16, 2019, Brown assigned to Plaintiff a similar workload than attorneys: Hunter, Maxwell and Allen.  Plaintiff was hired to work as an attorney.  As per Brown's instructions, Plaintiff would be trained by staff attorneys and work John Deacon's former cases.  Plaintiff assignment, according to Brown was to work the cases fully.  The court appearances would be made by staff attorneys.

95.

On May 17, Plaintiff workload was arbitrarily distributed among Hunter, Maxwell and Allen.  As consequence of this action, Plaintiff's workload was reduced to serving as companion of Brown in juvenile court. The reduction of Plaintiff's workload amounted to a constructive suspension.

96.

During Plaintiff's employment, co-workers: Hunter, Maxwell, Allen and Turner, isolated Plaintiff, kept him from performing any productive conduct and refused to provide Plaintiff any assignments.

97.

For purposes to determine a similarly situated employee, Plaintiff pleads that Plaintiff was similarly situated as: (a) the staff attorneys because Brown had established similar workload to Plaintiff or the purpose of Plaintiff's employment was to train to work as an attorney; (b) Robert

Leone, a Caucasian third year law student, because Hunter and Maxwell provided assignments to Leone and not to Plaintiff; and, (c) Thayer James Kolbo, a Caucasian male working as Paralegal 4 for the Council.

98.

On June 11, 2019, Plaintiff opposed the discrimination by making an oral complaint against co-workers: Maxwell, Allen, Hunter and Turner. Plaintiff spoke to Brown about his situation, but Brown, contrary of providing a work environment free of discrimination, ratified Hunter's decision to remove all Plaintiff's workload.

99.

Since Plaintiff's discharge, Plaintiff has been suffering of great and irreparable damages.

100.

Plaintiff's damages are the direct and proximate result of Brown, Hunter, Maxwell, Allen and Turner's unlawful acts.

COUNT II
RETALIATION FOR OPPOSING AN UNLAWFUL
PRACTICE UNDER TITLE VII

101.

This charge is against the Council under 42 U.S.C.S § 2000e-3(a) and Brown under 42 U.S.C.S § 1983 in his individual and official capacities for unlawfully removing any and all Plaintiff's workload in retaliation for asserting his right to be free of discrimination, seclusion and segregation based on his national origin.

102.

Paragraphs 1 through 100 are re-alleged as if set forth verbatim herein.

103.

19

Pursuant to 42 U.S.C.S § 2000e-3(a), an employer is prohibited to discriminate against any of its employees… because the employee has opposed any practice made unlawful by this subchapter.

104.

A plaintiff may establish a claim of unlawful retaliation by using either direct or circumstantial evidence. Wright v. Southland Corp., 187 F.3d 1287, 1292-93 (11th Cir. 1999).

105.

Under McDonnell Douglas Corp. Test, test for circumstantial evidence, plaintiffs must preliminarily establish a prima facie case of retaliation.  Holifield v. Reno, 115 F.3d 1555, 1556 (11th Cir. 1997).

106.

To establish a prima facie case, the Plaintiff must show (1) that [he] engaged in statutorily protected activity, (2) that [he] suffered an adverse employment action, and (3) that the adverse employment action is casually related to the protected activity." Cooper v. S. Co., 390 F.3d 695, 740 (11th Cir. 2004).

107.

Retaliation protects employees from disclosing materially adverse acts that affect the terms and conditions of their employment Burlington Northern & Santa Fe R. Co. v. White, 548 U.S. 53, 67 (2006).

A. PLAINTIFF ENGAGED IN PROTECTED ACTIVITY:

108.

Protected activity under Title VII falls under the participation or opposition clause." EEOC v. Total Sys., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).  While the participation clause requires filing a formal complaint with the EEOC, the opposition clause protects employees for

opposing, within the ordinary business environment, any practice made unlawful by Title VII.  Id. at 1176.

109.

During Plaintiff's employment, Plaintiff opposed repeatedly his seclusion and segregation during the ordinary course of business with Brown, Williams, Hunter, Allen, Maxwell and Ash to no avail.

110.

During Plaintiff's employment, Plaintiff repeatedly indicated to Williams and Robinson that Plaintiff lacked workload and Plaintiff was kept from performing.

111.

To be protected under the statute, the employee must show that: (a) he subjectively believed that he was being discriminated; and, (b) that his belief was objectively reasonable in light of the facts and record presented.  Id.

112.

On June 11, 2019, Plaintiff engaged in statutorily protected activity when he spoke with his Supervisor, Brown, regarding his legitimate concerns of seclusion, segregation and discrimination and lack of workload due to his national origin.

113.

The conversation constitutes protected activity because Brown was Plaintiff's supervisor and he ratified Hunter's decision to seclude, segregate and discriminate Plaintiff by officially removing all his workload.  Reasonable minds could argue that this constituted an unlawful act of discrimination reasonably linked to Plaintiff's national origin.

114.

Brown incurred in seclusion, segregation and discrimination of Plaintiff.  Reasonable minds could argue that Brown discriminated against Plaintiff to avoid forcing the staff attorneys to stop the seclusion, segregation and discrimination against Plaintiff.  This discrimination could be reasonably linked to Plaintiff's national origin.

115.

After three weeks of not being able to work and kept from participating in any work-related activities, Plaintiff had the sincere believe that he was segregated, secluded and discriminated, because of his national origin.  His seclusion and segregation amounted objectively to the level of a suspension.

B. PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION:

116.

For retaliation, courts have repeatedly held that the "materially adverse" for Title VII cases is "distinct and different" from the "serious and material change in terms, conditions or privileges of employment" standard applied to Title VII substantive discrimination claims.  Crawford v. Carroll, 529 F.3d 961, 974 (III)(A) n. 14 (11th Cir. 2008).

117.

The materially adverse test has been defined as more liberal test for adverse employment action.  Id. at 974.

118.

To meet this requirement, the plaintiff must show that: (a) the adverse employment action was significant rather than trivial.  Burlington 548 U.S. 53, 67.  And, that "there is a genuine issue of material fact as to whether his employer acted with … retaliatory intent in his termination." Mathis v. Leggett & Platt, 2008 WL 124512, 2 (11th Cir.

2008) citing Hawkins v. Ceco Corp., 883, F.2d 977, 980-81 (11th Cir.
1989).

1. SIGNIFICANCE OF THE ADVERSE EMPLOYMENT ACTION:

119.

To be considered materially adverse, the pleaded acts must be: (a)
significant enough to separate them from trivial harms such as, for
example, petty slights, minor annoyances and lack of good manners in the
workplace.  Burlington, 548 U.S. 53 at 68.  And, (b) these acts need to
raise to a level that would have dissuaded a reasonable employee from
making a disclosure.  Cobb v. City of Roswell, 533 Fed. Appx. 888, 896
(11th Cir. 2013).

120.

On or around June 11, 2019, Plaintiff suffered a significantly
material adverse employment action, when Brown ratified Hunter's decision
to keep Plaintiff with no workload and by tolerating his seclusion,
segregation and discrimination.  The change on the conditions of
employment was so significant that amounted to a constructive suspension.

121.

This event exceeds the liberal test established by the Supreme Court
in Burlington, because it amounted to a constructive suspension.  Brown
being the supervisor in charge had the power to ratify Hunter's decision
to remove Plaintiff's workload.

122.

Additionally, Brown personally violated the law, because he
participated himself on the unlawful segregation, seclusion and
discrimination by refusing to provide Plaintiff any assignments,
notwithstanding Plaintiff's numerous requests for work.

123.

Moreover, as in <u>Burlington</u>, these ratifications of segregation, seclusion and discrimination by Brown resulted in retaliation of the kind that keeps the employee from seeking further action.  Once Brown adopts a decision no one can refute his opinion because he gets verbally abusive and starts hitting furniture with his fist, when he does not get his way.  Reasonable minds could argue that not being heard by Brown would deter a reasonable person from seeking further action.

124.

This is more reasonable in an at-will state like Georgia in which an employee can be discharged for reason, no reason or even a bad reason so long it does not contravene the law.  Plaintiff as a head of a household needed to keep his job to provide for his family.  Therefore, it was reasonable for Plaintiff to prepare a well-supported case to avoid being retaliated against by Brown, instead of pressing for work assignments.

2. EVIDENCE OF RETALIATORY INTENT:

125.

Unlawful discrimination pursuant to Title VII does not require to be invidious but to be related to a person's national origin.  42 U.S.C. § 2000e2(a)(1).  Therefore, discrimination based on national origin is unlawful even is motivated by pure convenience or lack of interest.

126.

Reasonable minds could argue that Brown ratified Plaintiff's suspension from any activity because Brown did not want to inconvenient himself with the group once Brown realized that the staff had made the decision to relegate Plaintiff.

127.

This is a fair inference of Brown's annoyance when he was faced with the Plaintiff's reasonable concerns regarding being segregated, secluded and discriminated at work and kept from a fair opportunity to perform.

C. THE ADVERSE EMPLOYMENT ACTION IS CAUSED BY THE PROTECTED ACTIVITY:

128.

A Plaintiff may meet his burden by showing a short period of time between the protected activity and the termination.  This would prove that the two are not wholly unrelated. Shannon v. Bellsouth Telecoms. Inc., 292 F.3d 712, 717 (11th Cir. 2002).

129.

Nonetheless, the language used in a termination letter, standing alone, may support the causal link between the protected expression and the termination.  O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir. 2008).

130.

A fair inference of the Memorandum dated on August 1, 2019 tells us that, according to Brown, Plaintiff was discharged for not providing any aid to staff attorneys.

131.

However, this very fact could be reasonably caused by Brown and the staff attorneys themselves.  Reasonable minds could argue that Plaintiff's segregation, seclusion and discrimination resulted in his lack of performance necessary to justify his employment.

132.

For purposes to determine a similarly situated employee, Plaintiff pleads that Plaintiff was similarly situated as: (a) the staff attorneys, because Brown had established similar workload to Plaintiff or because the

purpose of Plaintiff's employment was to train to work as an attorney; (b) Robert Leone, a Caucasian third year law student, because Hunter indicated to Plaintiff that his employment was equivalent to an internship; and, (c) James Kolbo, a Caucasian male working as Paralegal 4 for the Council.

133.

Therefore, Brown cannot allege on one hand that Plaintiff did not perform up to the standards while on the other hand Brown kept Plaintiff from having a fair opportunity to perform.

134.

Furthermore, the document does not address Plaintiff's many requests for work to Maxwell, Hunter, Allen and Brown himself which constitute a persistent opposition to being secluded, segregated and discriminated.

135.

Reasonable minds could argue that Brown made the decision to keep Plaintiff with no workload and keep him from working once Brown realized that Plaintiff was not accepted by the staff attorneys.  Lack of performance would give Brown a pretext to discharge Plaintiff without raising suspicions.

COUNT III
RETALIATION FOR REPORTING DISCRIMINATION IN VIOLATION
OF THE GEORGIA WHISTLEBLOWER ACT

136.

This charge is against the Council and Brown in his official and individual capacities for removing Plaintiff's workload in retaliation for reporting segregation, seclusion and discrimination.

137.

Paragraphs 1 through 135 are re-alleged as if set forth verbatim herein.

138.

For purposes of the Whistleblower Act, a supervisor is the person with authority to direct and control public employee's work performance; to take corrective action; and, to receive complaints against public employees.  O.C.G.A § 45-1-4(a)(6).

139.

The Georgia Whistleblower Act precludes public employers from retaliating against their employees for "disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency; or, for objecting any activity that the public employee has reasonable cause to believe that is in violation of or noncompliance with a law, rule, or regulation."  O.C.G.A §.45-1-4(a)(5).

140.

The prohibition before mentioned includes the suspension or any adverse employment action taken by the public employer against a public employee in the terms or conditions of employment for disclosing a violation or noncompliance with a law, rule, or regulation.  O.C.G.A. § 45-1-4(d)(2) and (3).

141.

Brown is the sole supervisor at the Office with authority to hire and terminate public employee's employment, direct and control employee's work performance, take corrective action and receive complaints against public employees.

142.

Plaintiff's employment was terminated on August 1, 2019.

A. PRELIMINARY SHOWING FOR WHISTLEBLOWER CLAIMS:

143.

Plaintiffs must show the following: (1) the public employee was employed by a public employer; (2) the public employee made a protected disclosure or objection; (3) the public employee suffered and adverse employment action; and, (4) there is some causal link between the protected activity and the adverse employment action. Murray-Obertein v. Ga. Govt. Transparency and Campaign Finance Comm., 344 Ga. App. 677, 680-81 (2018).

144.

Plaintiff alleges the following: (1) he was employed by the Council on May 16, 2019 and terminated on August 1, 2019; (2) on June 11, 2019, Plaintiff engaged in protected activity when he complained about discrimination, seclusion and segregation with Brown; (3) Plaintiff lost his workload as a result of his disclosure with Brown; (4) reasonable minds could infer that Brown retaliated against Plaintiff for his national origin because: (a) Brown did not want to inconvenient his relationship with other employees, (b) it was convenient for Brown to let things be the way they were; (c) Brown did not want to investigate Plaintiff's claims further; or, (d) Brown has a difficult time hiring and keeping attorneys since he took over the Office.

B. MCDONNELL DOUGLAS TEST SHOWING:

145.

Courts in Georgia apply the McDonnell Douglas Test for claims brought under the Georgia Whistleblower Act. Franklin v. Pitts, 826 S.E. 2d 427, 431 (2019).

146.

Under the McDonnell Douglas Test, to establish a prima facie case, the Plaintiff must show "(1) that [he] engaged in statutorily protected

activity, (2) that [he] suffered an adverse employment action, and (3) that the adverse employment action is casually related to the protected activity." <u>Cooper</u>, 390 F.3d at 740.

1.   PLAINTIFF ENGAGED IN PROTECTED ACTIVITY:

147.

The Whistleblower Act makes illegal the retaliation against public employees for disclosing any violation to a law, rule or regulation in the State of Georgia. O.C.G.A § 45-1-4(a)(5).

148.

Moreover, the participation clause does not exclude activities different than the ones initiated at an EEOC procedure.  On the contrary, for the Whistleblower Act, "protected activity" is defined as the disclosure of noncompliance to a supervisor or government agency.  <u>Id</u>.

149.

The Georgia Whistleblower Act also covers, under protected activity, objections made against any activity, policy, or practice that the public employer has a reasonable cause to believe that is in violation with a law, rule, or regulation.  O.C.G.A. § 45-1-4(d)(2) and (3).

150.

For purposes to determine a similarly situated employee, Plaintiff pleads that Plaintiff was similarly situated as: (a) the staff attorneys, because Brown had established similar workload to Plaintiff or because the purpose of Plaintiff's employment was to train to work as an attorney; (b) Robert Leone, a Caucasian third year law student, because Hunter indicated to Plaintiff that his employment was equivalent to an internship; and, (c) James Kolbo, a Caucasian male working as Paralegal 4 for the Council.

151.

On June 11, Plaintiff went to his Supervisor's Office to complain about his co-workers.  Not having any assignments nor workload assigned, Plaintiff had the sincere and reasonable believe that he was discriminated because of his national origin.

152.

Every time Plaintiff asked why he could not have any assignments, Brown, Allen, Maxwell, Turner and Hunter did not provide any rational explanation.  Therefore, it was reasonable to infer that Plaintiff was discriminated based on his national origin.

153.

During Plaintiff's employment, Plaintiff opposed repeatedly, during the ordinary course of business, his seclusion, segregation and lack of workload with Brown, Williams, Hunter, Allen, Maxwell, Williams and Ash to no avail.

2. PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION:

154.

For retaliation, the Court of Appeals has held that the liberal Burlington Standard should not be applied to the Georgia Whistleblower Act.  For the court, retaliation shall amount to the level of discharge, suspension or demotion of the public employee.  Franklin, 826, S.E. 2d at 553.

155.

In other words, the public employee must show that he has suffered a serious and material change in the terms, conditions, or privileges of his employment.  Walker v. Indian River Transp. Co., 741 Fed. Appx. 740, 749 (III)(B) (11th Cir. 2018).

156.

The material change cannot be merely subjective, but it must be accompanied by a tangible harm or some unusual circumstance to be sufficient to prove adverse employment action.  Williams v. Great-West Healthcare, 2007 U.S. Dist. LEXIS 102132 at 22(D)(2) (N.D. GA. 2007), cited by Franklin at 437.

157.

On June 11, 2019, the removal of Plaintiff's entire workload coupled with a systematic seclusion and segregation from any activity amounted to his constructive suspension.  Plaintiff had not workload, assignments, projects or anything productive to perform for his employer.

158.

During the whole employment of Plaintiff, Plaintiff only performed one assignment which it was delegated by Spiegel an attorney working at Union county Office.  Plaintiff drove himself at his own expense to get work and assignments from the Union county Office in an effort to justify his employment.

3. THE ADVERSE EMPLOYMENT ACTION IS CASUALLY RELATED TO THE PROTECTED ACTIVITY:

159.

A Plaintiff may meet his burden by showing a short period of time between the protected activity and the termination.  This would prove that the two are not wholly unrelated. Shannon v. Bellsouth Telecoms. Inc., 292 F.3d 712, 717 (11th Cir. 2002).

160.

The language used in a termination letter, standing alone, may support the causal link between the protected expression and the

termination.   O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir. 2008).

161.

A fair inference of the Memorandum dated on August 1, 2019 tells us that, according to Brown, Plaintiff was discharged for not providing any aid to staff attorneys.

162.

However, this very fact could be reasonably caused by Brown and the staff attorneys themselves.  Reasonable minds could argue that Plaintiff's segregation, seclusion and discrimination resulted in Plaintiff's lack of performance necessary to justify his employment.

163.

Therefore, Brown cannot allege on one hand that Plaintiff did not perform to his satisfaction, while on the other hand Brown kept Plaintiff from having a fair opportunity to perform.  Plaintiff cannot draw any logical inference to justify a business decision of such nature.

164.

Furthermore, the document does not address Plaintiff's many requests for work to Maxwell, Hunter, Allen and Brown himself which constitute a persistent opposition to be secluded, segregated and discriminated.

165.

Reasonable minds could argue that Brown made the decision to keep Plaintiff with no workload and keep him from working once Brown realized that Plaintiff was not accepted by the staff attorneys.  Lack of performance would give Brown a pretext to discharge Plaintiff without raising suspicions.

COUNT IV

<u>RETALIATION FOR OPPOSING A CRIMINAL ACT IN</u>
<u>VIOLATION OF THE GEORGIA WHISTLEBLOWER ACT</u>

166.

This charge is against the Council for terminating Plaintiff's employment in retaliation for opposing a criminal act against himself.

167.

Paragraphs 1 through 165 are re-alleged as if set forth verbatim herein.

168.

A person commits aggravated assault when unlawfully, using a "deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." O.C.G.A. § 16-5-21(a)(2).

169.

The Georgia Whistleblower Act precludes public employers from retaliating against their employees for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency; or, for objecting any activity that the public employee has reasonable cause to believe that is in violation of or noncompliance with a law, rule, or regulation. O.C.G.A §.45-1-4(a)(5).

170.

The prohibition before mentioned includes the suspension or any adverse employment action taken by the public employer against a public employee in the terms or conditions of employment for disclosing a violation of or noncompliance with a law, rule, or regulation. O.C.G.A. § 45-1-4(d)(2) and (3).

171.

On July 9, 2019, Plaintiff alleges that Brown, maliciously, willfully or with the intent to harm, committed one count of aggravated assault and two counts of assault against Plaintiff.

172.

Aggravated assault was committed while Brown holding the dull knife making movements consisting with the stabbing of a person. Plaintiff had the reasonable belief that Brown would either throw the dull knife at him or lose his grip.

173.

One assault took place when Brown closed the distance between himself and Plaintiff by storming tumultuously into Plaintiff's Office.

174.

The second assault took place in Plaintiff's Office. Plaintiff alleges that was placed in the state of apprehension twice when Brown was moving his hands in the air at very close proximity.

175.

A fair inference indicates that, during all three attacks, Plaintiff was in reasonable fear to be in imminent harm of serious bodily harm; or, at the very least, of being stricken by Brown when Brown was moving his hands angry and screaming out of the top of his lungs.

A. PRELIMINARY SHOWING FOR WHISTLEBLOWER CLAIMS:

176.

Plaintiffs must show the following: (1) the public employee was employed by a public employer; (2) the public employee made a protected disclosure or objection; (3) the public employee suffered and adverse employment action; and, (4) there is some causal link between the protected activity and the adverse employment action. Murray-Obertein v.

Ga. Govt. Transparency and Campaign Finance Comm., 344 Ga. App. 677, 680-81 (2018).

177.

Plaintiff alleges the following: (1) he was employed by the Council on May 16, 2019 and terminated on August 1, 2019; (2) on June 11, 2019, Plaintiff engaged in protected activity when he complained about discrimination, seclusion and segregation with Brown; (3) On August 1, 2019, Plaintiff employment was terminated; (4)reasonable minds could infer that Brown retaliated against Plaintiff in fear of losing his employment, being accused of committing a crime.

B.   MCDONNELL DOUGLAS TEST SHOWING:

178.

Courts in Georgia apply the McDonnell Douglas Test for claims brought under the Georgia Whistleblower Act.  Franklin, 826 S.E. 2d at 431.

179.

Under the McDonnell Douglas Test, to establish a prima facie case, the Plaintiff must show (1) that [he] engaged in statutorily protected activity, (2) that [he] suffered an adverse employment action, and (3) that the adverse employment action is casually related to the protected activity." Cooper, 390 F.3d at 740.

1.   PLAINTIFF ENGAGED IN PROTECTED ACTIVITY:

180.

The Georgia Whistleblower Act covers protected activity, in the form of objections made against any activity, policy, or practice that the public employer has a reasonable cause to believe that is in violation with a law, rule, or regulation.  O.C.G.A. § 45-1-4(d)(2) and (3).

181.

On July 9, Plaintiff opposed Brown's attack by retreating to his
Office when Brown grabbed a dull knife and started making movements
consisting with the stabbing of a person while using profanity.

182.

On July 9, Plaintiff opposed this conduct by making statements to
Ash and Williams relative to the efficiency of the Office and Brown's
mental state.

183.

On July 9, Plaintiff opposed this conduct by telling Hunter about
the incident.  Plaintiff shared with Hunter his concerns about losing his
employment.

184.

On July 10, Plaintiff opposed Brown's attack by telling Brown that
he wanted to report his conduct.  However, Plaintiff did not get
information regarding a contact in Human Resources until two days later.
At that point, Plaintiff needed to concentrate on taking the Georgia Bar.

185.

On July 12, Plaintiff opposed Brown's conduct by telling Dawson
about the incident.  Plaintiff wanted to obtain advice regarding Brown's
unreasonable violent behavior.  Turner was present during the
conversation.

186.

On July 12, Plaintiff opposed Brown's conduct by speaking with Belback about his concerns regarding Brown's mental state and level of violence showed by Brown.

187.

On July 12, Plaintiff spoke with Allen regarding Brown's conduct.

2.   PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION:

188.

For retaliation, the Court of Appeals has held that the liberal Burlington Standard should not be applied to the Georgia Whistleblower Act.  For the court, retaliation, under the Whistleblower Act, shall raise to the level of discharge, suspension or demotion of the public employee to constitute an adverse employment action.  Franklin, 826, S.E. 2d at 553.

189.

In other words, the public employee must show that he has suffered a serious and material change in the terms, conditions, or privileges of his employment.  Walker, 741 Fed. Appx. 740, at 749 (III)(B).

190.

The material change cannot be merely subjective, but it must be accompanied by a tangible harm or some unusual circumstance to be sufficient to prove adverse employment action.  Williams v. Great-West Healthcare, 2007 U.S. Dist. LEXIS 102132 at 22(D)(2) (N.D. GA. 2007), cited by Franklin at 437.

191.

On August 1, Plaintiff's employment was terminated.

3.   THE ADVERSE EMPLOYMENT ACTION IS CAUSALITY RELATED TO THE PROTECTED
     ACTIVITY:

                            192.

     A Plaintiff may meet his burden by showing a short period of time

between the protected activity and the termination.  This would prove that

the two are not wholly unrelated. Shannon v. Bellsouth Telecoms. Inc., 292

F.3d 712, 717 (11th Cir. 2002).

                            193.

     The language used in a termination letter, standing alone, may

support the causal link between the protected activities and the

termination.  O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir.

2008).

                            194.

     A fair inference of the Memorandum dated on August 1, 2019 tells us

that, according to Brown, Plaintiff was discharged because Plaintiff

disrespected Brown.   However, Plaintiff characterizes the incident as

aggravated assault against himself rather.

                            195.

     Reasonable minds could argue that Brown made the decision to

discharge Plaintiff was an easy way to get rid of a liability.  Brown

could not afford to have someone speaking about his mental state in the

Office where he is the boss.

                         COUNT V
             RETALIATION IN VIOLATION OF FREEDOM OF
              SPEECH UNDER THE GEORGIA CONSTITUTION

                            196.

     This cause of action is brought against the Council, pursuant to GA.

CONST. art. I, for unlawfully abridging Plaintiff's freedom of speech

about matters of public concern related to his employment.

                             38

197.

Paragraphs 1 through 195 are re-alleged as if set forth verbatim herein.

198.

"No law shall be passed to curtail or restrain the freedom of speech or of the press.  Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty." GA. CONST. art. I, § I.

199.

The Council is an independent state agency duly represented by Brown.  While the Council is entitled to terminate employment of at will employees, the Council's discretion is limited to acts of retaliation against public employees for expressing matters of public concern.  Alves, 804 F.3d 1149, 1159.

200.

The commission of a crime and improper behavior by a public official is a matter of public concern.

A. RETALIATORY INTENT:

1. "[T]he plaintiff must demonstrate that there is a genuine issue of material fact as to whether his employer acted with … retaliatory intent in his termination." Mathis v. Leggett & Platt, 2008 WL 124512, 2 (11th Cir. 2008) citing Hawkins v. Ceco Corp., 883, F.2d 977, 980-81 (11th Cir. 1989).  A plaintiff may establish a claim of unlawful retaliation by using either direct or circumstantial evidence. Wright v. Southland Corp., 187 F.3d 1287, 1292-93 (11th Cir. 1999).

1. DIRECT EVIDENCE OF RETALIATORY INTENT:

201.

Direct Evidence is evidence that "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Van Voorhis v. Hillsborough County Bd. Of County Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2004).

202.

The language used in a termination letter, standing alone, may support the causal link between the protected activities and the termination.  O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir. 2008).

203.

The Memorandum hand delivered to Plaintiff on August 1, 2019, clearly indicates that one of the reasons for Plaintiff's termination was that he walked out of Brown's Office in an alleged disrespect.

204.

The Memorandum also states that Brown was angry during the incident. A fair inference can be drawn as to Brown's retaliatory animus by being angry at the Plaintiff.

2.  CIRCUMSTANTIAL EVIDENCE OF RETALIATORY INTENT:

205.

Georgia is an at-will state in which an employer can terminate an employee's employment for good reason, no reason or even a lawful bad reason. Therefore, why did Brown justify Plaintiff's termination on a letter, since Brown did not need any justification?

206.

Reasonable minds could argue that, the reasons proffered by Brown on his termination letter were pretextual to cover up a contingency. Plaintiff had become a liability for Brown's employment because Plaintiff

was talking to other employees and because Plaintiff's action on walking out of his Office could be reasonably understood as a sign of weakness. Brown needed to vindicate his authority in the Office by terminating Plaintiff's employment.

207.

A logical inference sustains that Plaintiff was a threat to Brown's employment that needed to be terminated as soon as possible.  This may explain why Brown had to think so much about granting the leave or terminating Plaintiff's employment sooner and why Brown needed to justify Plaintiff's termination in a letter.

208.

Furthermore, Brown never disciplined Plaintiff because of his allege disrespect.  Perhaps because it would have started an internal investigation.  On the other hand, Plaintiff alleges that he walked out of Brown's Office not in disrespect but in fear for his well-being.

209.

Brown had a reason to protect his employment, if he were terminated, Brown will lose his health insurance to pay for his health issues.

210.

Brown cannot afford to retire because his income would be dramatically reduced.

211.

Therefore, reasonable minds could argue that Plaintiff's termination corresponds to a self-preservation motive rather than a business judgment decision.

  B.  PROTECTED SPEECH:

212.

A public employee's speech may be protected if it is conveyed expressly by words or by conduct. To be protected under the First Amendment, messages conveyed by conduct must be understood with no explanatory speech.  If the conduct at issue is so inherently expressive it is protected under the First Amendment.  Allied Veterans of the World, Inc. v. Seminole County, 2011 U.S. Dist. LEXIS 101003.

213.

It is the employee's desire to raise issues of public concern what triggers constitutional protection.  Boyce v. Andrew, 510 F.3d 1333, 1344 (11th Cir. 2007).

214.

It is reasonable to assume that Plaintiff's conduct by walking out of Brown's Office is protected under the First Amendment because it does not require further explanation.

215.

Based on the circumstances, reasonable minds could infer that walking out of the Office of a man with a violent character like Brown constitutes inherently expressive conduct.

216.

In fact, Brown seems to corroborate this interpretation in his Memorandum of August 1, by considering this conduct a serious disrespect that made him angry.

217.

Plaintiff pleads the testimony of Brown, Ash, Williams, Allen, Turner and Dawson to corroborate that Plaintiff engaged in protected activity by expressing concerns regarding Brown's conduct on the July 9th

incident.  Said comments were made repeatedly to the Office's employees, at the Office and during the ordinary course of business.

218.

Going after the person who has the ability to terminate one's employment in at-will state requires building a solid case with evidence. For that reason, Plaintiff's decision to wait until gathering all the information relative to his charges is reasonable.

219.

Therefore, the fact that Plaintiff did not pursue immediate legal action should not be inferred as a lack of desire to create a level of public concern, but as a prudent decision.

220.

If Brown was an ordinary man, Plaintiff would have filed a charge immediately, but in this case, Brown is a public government official with qualified immunity and connections who could terminate Plaintiff's employment immediately.

221.

Thus, it is reasonable to consider that there was a disparate relation between Plaintiff and Brown that deterred Plaintiff from seeking immediate relief.

222.

It is also reasonable to consider the shock of being attack by a supervisor.  A reasonable person will take a few days to react and evaluate the different alternatives to obtain a legal remedy.

C. ANALYSIS TO DETERMINE WHETHER PUBLIC EMPLOYEE'S SPEECH IS PROTECTED UNDER THE FIRST AMENDMENT:

223.

The Supreme Court has outlined a two-step inquiry to determine whether public employee's speech is protected.  First, the employee must have spoken as a citizen on a matter of public concern and if so, the court must determine whether the public employer was justified in treating the employee differently than the members of the general public. Alves v. Bd. Of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1162 (11th Cir. 2015).

1. MATTER OF PUBLIC CONCERN:

224.

To meet this prong, the Plaintiff must clearly indicate that the abridged speech is worthy of public concern.  The threshold for this prong is very light since even pure speculative theory of corruption in government may raise to the level of public concern. Stanley v. City of Dalton, 219 F.3d 1280, 1289 (11th Cir. 2000).

225.

If the charging party meets the public concern prong, then the court must determine whether the employee's First Amendment interest promotes efficiency of the public services.  For that matter the courts have elaborated a three prong tests: (a) whether the speech at issue impedes the government's ability to perform its duties efficiently; (b) the manner, time, and place of the speech; and (c) the context within which the speech was made. Id. at 1289.

226.

Plaintiff alleges that, (a) Plaintiff's speech did not interfere with the normal operations of the Office, it was not made in a vulgar or disrespectful matter nor created a negative environment; (b) the speech was made in a manner, time and place appropriate and in a way that did not

interfere with the Office's functions, since Plaintiff was not reprimanded; and, (c) the context in which the speech was made was appropriate due to the circumstances.

227.

The commission of a crime or impermissible treatment of public employees by the chief of a public defender's office could be reasonably understood as a matter of public concern in the community, because the integrity of said officer reflects on the prestige of the public defender's council as an institution.

228.

On the other hand, reasonable minds could argue that Plaintiff had a right to be treated as anyone else in the general public when speaking regarding a matter of public concern.

2. SUBSTANTIAL FACTOR IN TERMINATION:

229.

The charging party must show any inference of causation.  Time proximity provides enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate him.  Beckwith, 58 F.3d at 1567.

230.

The language used in a termination letter, standing alone, may support the causal link between the protected expression and the termination.  O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir. 2008).

231.

The Memorandum, dated August 1, 2019, clearly indicates that one of the major contributors for the termination of Plaintiff is what Brown considers Plaintiff's disrespect by walking out of his Office.

232.

And, the other three reasons provided by Brown are illogical nor satisfy the requirement of be based on neutral standards.

233.

In addition, Plaintiff is pleading a logical reason to infer that the reasons provided by Brown are pretextual.  The termination was made within 20 days of the incident and Brown has a self-preservation motive for the Plaintiff's termination.

234.

Reasonable minds could conclude that the termination was made in fear that Plaintiff would file a criminal charge or a complaint with Human Resources.

COUNT VI
RETALIATION IN VIOLATION OF FREEDOM OF SPEECH
UNDER THE U.S. CONSTITUTION

235.

This cause of action is brought against the Council, pursuant to GA. CONST. art. I, for unlawfully abridging Plaintiff's freedom of speech about matters of public concern related to his employment.

236.

Paragraphs 1 through 234 are re-alleged as if set forth verbatim herein.

237.

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of

speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

238.

The Council is an independent state agency duly represented by Brown.  While the Council is entitled to terminate employment of at will employees, the Council's discretion is limited to acts of retaliation against public employees for expressing matters of public concern.  Alves, 804 F.3d 1149, 1159.

239.

The commission of a crime and improper behavior by a public official is a matter of public concern.

D.  RETALIATORY INTENT:

2.  "[T]he plaintiff must demonstrate that there is a genuine issue of material fact as to whether his employer acted with … retaliatory intent in his termination." Mathis v. Leggett & Platt, 2008 WL 124512, 2 (11th Cir. 2008) citing Hawkins v. Ceco Corp., 883, F.2d 977, 980-81 (11th Cir. 1989).  A plaintiff may establish a claim of unlawful retaliation by using either direct or circumstantial evidence. Wright v. Southland Corp., 187 F.3d 1287, 1292-93 (11th Cir. 1999).

3.  DIRECT EVIDENCE OF RETALIATORY INTENT:

240.

Direct Evidence is evidence that "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Van Voorhis v. Hillsborough County Bd. Of County Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2004).

241.

The language used in a termination letter, standing alone, may support the causal link between the protected activities and the termination.  O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir. 2008).

242.

The Memorandum hand delivered to Plaintiff on August 1, 2019, clearly indicates that one of the reasons for Plaintiff's termination was that he walked out of Brown's Office in an alleged disrespect.

243.

The Memorandum also states that Brown was angry during the incident. A fair inference can be drawn as to Brown's retaliatory animus by being angry at the Plaintiff.

4. CIRCUMSTANTIAL EVIDENCE OF RETALIATORY INTENT:

244.

Georgia is an at-will state in which an employer can terminate an employee's employment for good reason, no reason or even a lawful bad reason. Therefore, why did Brown justify Plaintiff's termination on a letter, since Brown did not need any justification?

245.

Reasonable minds could argue that, the reasons proffered by Brown on his termination letter were pretextual to cover up a contingency. Plaintiff had become a liability for Brown's employment because Plaintiff was talking to other employees and because Plaintiff's action on walking out of his Office could be reasonably understood as a sign of weakness. Brown needed to vindicate his authority in the Office by terminating Plaintiff's employment.

246.

A logical inference sustains that Plaintiff was a threat to Brown's employment that needed to be terminated as soon as possible.  This may explain why Brown had to think so much about granting the leave or terminating Plaintiff's employment sooner and why Brown needed to justify Plaintiff's termination in a letter.

247.

Furthermore, Brown never disciplined Plaintiff because of his allege disrespect.  Perhaps because it would have started an internal investigation.  On the other hand, Plaintiff alleges that he walked out of Brown's Office not in disrespect but in fear for his well-being.

248.

Brown had a reason to protect his employment, if he were terminated, Brown will lose his health insurance to pay for his health issues.

249.

Brown cannot afford to retire because his income would be dramatically reduced.

250.

Therefore, reasonable minds could argue that Plaintiff's termination corresponds to a self-preservation motive rather than a business judgment decision.

E.  PROTECTED SPEECH:

251.

A public employee's speech may be protected if it is conveyed expressly by words or by conduct. To be protected under the First Amendment, messages conveyed by conduct must be understood with no explanatory speech.  If the conduct at issue is so inherently expressive

it is protected under the First Amendment.  Allied Veterans of the World, Inc. v. Seminole County, 2011 U.S. Dist. LEXIS 101003.

### 252.

It is the employee's desire to raise issues of public concern what triggers constitutional protection.  Boyce v. Andrew, 510 F.3d 1333, 1344 (11th Cir. 2007).

### 253.

It is reasonable to assume that Plaintiff's conduct by walking out of Brown's Office is protected under the First Amendment because it does not require further explanation.

### 254.

Based on the circumstances, reasonable minds could infer that walking out of the Office of a man with a violent character like Brown constitutes inherently expressive conduct.

### 255.

In fact, Brown seems to corroborate this interpretation in his Memorandum of August 1, by considering this conduct a serious disrespect that made him angry.

### 256.

Plaintiff pleads the testimony of Brown, Ash, Williams, Allen, Turner and Dawson to corroborate that Plaintiff engaged in protected activity by expressing concerns regarding Brown's conduct on the July 9th incident.  Said comments were made repeatedly to the Office's employees, at the Office and during the ordinary course of business.

### 257.

Going after the person who has the ability to terminate one's employment in at-will state requires building a solid case with evidence.

For that reason, Plaintiff's decision to wait until gathering all the information relative to his charges is reasonable.

258.

Therefore, the fact that Plaintiff did not pursue immediate legal action should not be inferred as a lack of desire to create a level of public concern, but as a prudent decision.

259.

If Brown was an ordinary man, Plaintiff would have filed a charge immediately, but in this case, Brown is a public government official with qualified immunity and connections who could terminate Plaintiff's employment immediately.

260.

Thus, it is reasonable to consider that there was a disparate relation between Plaintiff and Brown that deterred Plaintiff from seeking immediate relief.

261.

It is also reasonable to consider the shock of being attack by a supervisor. A reasonable person will take a few days to react and evaluate the different alternatives to obtain a legal remedy.

F. ANALYSIS TO DETERMINE WHETHER PUBLIC EMPLOYEE'S SPEECH IS PROTECTED UNDER THE FIRST AMENDMENT:

262.

The Supreme Court has outlined a two-step inquiry to determine whether public employee's speech is protected. First, the employee must have spoken as a citizen on a matter of public concern and if so, the court must determine whether the public employer was justified in treating the employee differently than the members of the general public. Alves v.

Bd. Of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1162 (11th Cir. 2015).

3. MATTER OF PUBLIC CONCERN:

263.

To meet this prong, the Plaintiff must clearly indicate that the abridged speech is worthy of public concern.  The threshold for this prong is very light since even pure speculative theory of corruption in government may raise to the level of public concern. Stanley v. City of Dalton, 219 F.3d 1280, 1289 (11th Cir. 2000).

264.

If the charging party meets the public concern prong, then the court must determine whether the employee's First Amendment interest promotes efficiency of the public services.  For that matter the courts have elaborated a three prong tests: (a) whether the speech at issue impedes the government's ability to perform its duties efficiently; (b) the manner, time, and place of the speech; and (c) the context within which the speech was made. Id. at 1289.

265.

Plaintiff alleges that, (a) Plaintiff's speech did not interfere with the normal operations of the Office, it was not made in a vulgar or disrespectful matter nor created a negative environment; (b) the speech was made in a manner, time and place appropriate and in a way that did not interfere with the Office's functions, since Plaintiff was not reprimanded; and, (c) the context in which the speech was made was appropriate due to the circumstances.

266.

The commission of a crime or impermissible treatment of public employees by the chief of a public defender's office could be reasonably understood as a matter of public concern in the community, because the integrity of said officer reflects on the prestige of the public defender's council as an institution.

267.

On the other hand, reasonable minds could argue that Plaintiff had a right to be treated as anyone else in the general public when speaking regarding a matter of public concern.

4. SUBSTANTIAL FACTOR IN TERMINATION:

268.

The charging party must show any inference of causation.  Time proximity provides enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate him.  Beckwith, 58 F.3d at 1567.

269.

The language used in a termination letter, standing alone, may support the causal link between the protected expression and the termination.  O'Connor v. Houston, 2008 U.S. Dist. Lexis 22779 (11th Cir. 2008).

270.

The Memorandum, dated August 1, 2019, clearly indicates that one of the major contributors for the termination of Plaintiff is what Brown considers Plaintiff's disrespect by walking out of his Office.

271.

And, the other three reasons provided by Brown are illogical nor satisfy the requirement of be based on neutral standards.

272.

In addition, Plaintiff is pleading a logical reason to infer that the reasons provided by Brown are pretextual.  The termination was made within 20 days of the incident and Brown has a self-preservation motive for the Plaintiff's termination.

273.

Reasonable minds could conclude that the termination was made in fear that Plaintiff would file a criminal charge or a complaint with Human Resources.

<u>COUNT VII</u>
<u>CONSPIRACY TO DISCRIMINATE</u>
<u>AGAINST PLAINTIFF</u>

274.

This cause of action is against Hunter, Maxwell, Turner, Ash and Allen for invidiously conspiring against Plaintiff's due to his national origin and/or race.

275.

Paragraphs 1 through 273 are re-alleged as if set forth verbatim herein.

276.

To establish a claim under 42 U.S.C. § 1985(3), plaintiffs must allege and prove: (a) a conspiracy; (b) for the purpose of depriving any person the equal protection of the laws, or equal privileges and immunities under laws; (c) an act in furtherance of the conspiracy; and, (d) injury to the person's property, rights or privileges as citizen of the United States.

277.

Plaintiff alleges the following: (a) Hunter, Maxwell, Turner and Allen, invidiously conspired against Plaintiff for reasons of his national origin and/or race, by removing Plaintiff's workload and keeping Plaintiff from performing; (b) for the purpose of causing his termination from employment and/or enjoying a work environment free of discrimination; (c) Hunter, Maxwell, Turner, Ash and Allen, systematically secluded, segregated and kept Plaintiff from performing any activity during all his employment with the Council; and, (d) as a result of this actions, Plaintiff's employment was subsequently terminated by Brown on August 1, 2019.

<u>COUNT VIII</u>
<u>ASSAULT</u>

278.

This cause of action is against Brown in his official and individual capacities for committing assault against Plaintiff on July 9, 2019.

279.

Paragraphs 1 through 277 are re-alleged as if set forth verbatim herein.

280.

Brown maliciously, willfully or with the intent to harm Plaintiff, caused Plaintiff reasonable fear of imminent and harmful contact.

281.

As a result of Brown's assault, Plaintiff suffered physical, mental/emotional pain and suffering.

282.

The injuries sustained by Plaintiff were the direct result of Brown's assault.

283.

Plaintiff's injuries are the proximate and foreseeable result of Brown's assault on Plaintiff.  Plaintiff has suffered severe mental and emotional pain and suffering, loss of enjoyment of life, lost wages, among other damages.

COUNT IX
INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS UPON PLAINTIFF

284.

This cause of action is against Brown in his individual and official capacities for intentional infliction of emotional distress upon Plaintiff.

285.

Paragraphs 1 through 283 are re-alleged as if set forth verbatim herein.

286.

On July 9th, 2019, Brown maliciously, willfully and with the intent to harm Plaintiff, placed Plaintiff in reasonable state of fear.

287.

Brown maliciously, willfully and with the intent to harm Plaintiff, threatened Plaintiff's physical integrity as well as his employment to keep Plaintiff from disclosing his actions during the altercation and/or incident of July 9th, 2019.

288.

Brown threats, acts, gestures and conduct, during the July 9th altercation and/or incident and subsequently, were extreme and outrageous as they went beyond all bounds of decency in a civilized community.

289.

As a result of Brown's acts of threats to terminate Plaintiff's employment, aggravated assault and two counts of simple assault, Plaintiff suffered severe emotional distress, emotional pain and suffering, loss of enjoyment of life, lost wages, and other damages.

290.

Plaintiff's severe emotional distress is the direct results of Brown's violent acts, words, and gestures.

291.

Plaintiff's injuries are the proximate and foreseeable result of Brown's words, acts and gestures on Plaintiff.  Plaintiff has suffered severe mental and emotional pain and suffering, loss of enjoyment of life, lost wages, among other damages.

COUNT X
PUNITIVE DAMAGES AGAINST BROWN

292.

This cause of action is against Defendant Brown.

293.

Paragraphs 1 through 291 are re-alleged as if set forth verbatim herein.

294.

Pursuant to O.C.G.A. § 51-12-5.1(b), acts of willful misconduct constitute an aggravated circumstance which authorizes the imposition of punitive damages against Brown.

295.

Brown's extreme and outrageous conduct in the form of aggravated assault, simple assault and intentional infliction of emotional distress upon Plaintiff was malicious, willful and with the intent to harm him.

COUNT XI
PUNITIVE DAMAGES AGAINST HUNTER, ALLEN,
MAXWELL, TURNER AND ASH

296.

This cause of action is under 42 U.S.C. § 1983, against Brown, Hunter, Maxwell, Turner, Allen and Ash for conspiring to violate Plaintiff's federal rights maliciously or with reckless disregard of same.

297.

Paragraphs 1 through 295 are re-alleged as if set forth verbatim herein.

298.

Pursuant to 42 U.S.C.S § 1981a(b)(1), plaintiffs may recover punitive damages against defendants upon demonstrating that defendants engaged in malicious or reckless indifference to federally protected rights of an aggrieved individual.

299.

Defendants Brown, Hunter, Maxwell, Turner, Allen and Ash conspired maliciously or with reckless disregard of Plaintiff's federally protected rights by secluding him, refusing to provide any assignments and/or keeping him from performing any activity to force his termination from employment.

300.

Defendant's damages are the direct result of Brown, Hunter, Maxwell, Turner, Allen and Ash actions.

301.

Plaintiff's injuries are the proximate and foreseeable result of Defendants Brown, Hunter, Maxwell, Turner, Allen and Ash's actions.

Plaintiff has suffered severe mental and emotional pain and suffering, loss of enjoyment of life, lost wages, among other damages.

PRAYER FOR RELIEF:

WHEREFORE, Plaintiff respectfully request the following: (a) his reinstatement to the same position Plaintiff held before the retaliation or to an equivalent position; (b) reinstatement of full fringe benefits and seniority rights; (c) compensation for lost wages, benefits, and other remuneration; (d) any compensatory damages allowable at law; and, (e) all damages, including, but not limited to, all general damages, special economic, punitive and other allowable damages, in accordance with the enlightened conscience of an impartial jury, and (f) reasonable attorney's fees, court cost and expenses.

Jury Trial:

Plaintiff respectfully request this Court to grant a jury by trial of twelve (12) members of all counts in the above-styled cause of action.

Respectfully submitted this 3rd day of December 2019.

_____
Javier R Benavides
Pro Se
1399 Brookmere Way,
Cumming, Georgia 30040
470.281.0341
jabeluna@gmail.com

General Affidavit

Javier R Benavides, in the presence of the Name of Affiant
undersigned notary public, under oath certifies that the statements of
fact contained in this document are true.

Javier Benavides

_12/02/2019_
Date

STATE OF GEORGIA
COUNTY OF FORSYTH

Signed and sworn before me on _December 2, 2019_

By: Javier R Benavides

Whom it is proved to me on the basis of satisfactory evidence to be the
person who appeared before me.

(signature of notary public)

Tammie W. Kennedy
Notary Public, State of Georgia

Stamp/Seal

TAMMIE W. KENNEDY
NOTARY
Comm. Exp.
GEORGIA
Sept. 6, 2020
PUBLIC
HALL COUNTY

My commission expires: _Sept 6, 2020_

59



Exhibit A

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: Javier R. Benavides
1399 Brookmere Way
Cumming, GA 30040

From: Atlanta District Office
100 Alabama Street, S.W.
Suite 4R30
Atlanta, GA 30303

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 11B-2019-00136 | Joyce A. Dawkins,<br>State & Local Coordinator | (404) 562-6881 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged
discrimination to file your charge

☐ The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the
information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with
the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒ Other (briefly state)        Duplicate Charge-filing.

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age
Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.
You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your
lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be
lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the
alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>**
before you file suit may not be collectible.

On behalf of the Commission

Darrell E. Graham,
District Director

SEP 2 5 2019
(Date Mailed)

Enclosures(s)

cc:      Jimminique Rodgers
Interim Director
GEORGIA PUBLIC DEFENDERS COUNCIL
104 Marietta Street N.W. #600
Atlanta, GA 30303

Exhibit A

# Exhibit B

5/9/19

**GEORGIA PUBLIC DEFENDER COUNCIL**
**PERSONNEL ACTION FORM**
SUBMIT TO: HR-REQUEST@GAPUBLICDEFENDER.ORG

| | | | | | |
|---|---|---|---|---|---|
| Circuit / Office | ENOTAH/CLEVELAND, GA | 20 | | Today's Date | 5/9/2019 |
| Type of Funds | ☐ State ☑ Local | Position # | 00181366 | Supervisor Position # | 00179514 |
| Department # | 492034- | Job Code | | Fund Code # | |
| Supervisor Name | HARLES B. BROW | Employee ID# | ▮▮▮ | Social Security # | ▮▮▮ |
| Name | BENAVIDES | | JAVIER | | R. |
| | Last | | First | | Middle |
| Address | ▮▮▮ | | | | |
| | City | | State | Zip | County |

## TYPE OF ACTION

| Effective Date of Action | 5/16/2019 | | | | |
|---|---|---|---|---|---|
| New Employee (Full Time)* | | ☑ | Regular | ☑ | Promotion |
| New Employee (Part Time) | | | Temporary | | Salary Change |
| Employee Transfer* | | | Seasonal | | Retirement / Resignation |
| Other | | | Time Limited | | Termination / Dismissal* *Attach Justification |

*Is employee transferring from or to a different Circuit/Office **OR** from or to another State Agency?   ☐ Yes ☑ No

492-921CC

## TITLE / SALARY INFORMATION
### CURRENT

| Position Title | PARALEGAL 4 | Pay Grade/Step | |
|---|---|---|---|
| Annual Salary | $46,443.00 | Semi Monthly Salary | $1,935.13 |
| Comments: | | Funding Source | |

## TITLE / SALARY INFORMATION
### CHANGE TO

| Position Title | | Pay Grade/Step | |
|---|---|---|---|
| Annual Salary | | Semi Monthly Salary | |
| Comments: | | Funding Source | |

CIRCUIT PUBLIC DEFENDER OR OFFICE HEAD     DATE     5-9-19

HUMAN RESOURCES MANAGER     DATE

EXECUTIVE DIRECTOR     DATE

For attorney positions please indicate whether employee is in good standing with the Georgia Bar or date for taking Bar Exam

_____ Bar Number _____

*I understand I am responsible for ensuring this employee meets or exceeds all qualifications and actually works according to the type of action specified above.*

Exhibit C-1

Internal File Memorandum

Re:    Javier Benevides

Date:   July 26 & 29, 2019

This memorandum is prepared for the purpose of preserving events and communications with/concerning Javier Benevides and his employment with our office beginning effective May 16, 2019.

It appears that shortly after his hire the Bar results were published and he did not pass the Bar exam. While I was aware of his failure to pass, I first contacted Todd Dawson to advise him and get his reaction. He was both surprised and displeased. While we had previously hired attorneys who had not yet passed, all of them soon passed the bar. As Javier had graduated from a very reputable law school I was also shocked and dismayed at his failure to pass. I intended to talk to Javier right away but, to his credit, he promptly contacted me and advised of his failure.

We immediately discussed the matter and I contacted the Atlanta office and was advised that he could not operate under the 3rd year practice act but could stay on as a legal assistant. This was not a good resolution, as it did not relieve our other attorneys from their enhanced work load, but that was the resolution we reached until he retook the exam and passed the bar. During the interim he would keep files formerly of John Deacon and work them but all court appearances would be made by staff attorneys.

Around the 1st week of July Javier came to me to request, I believe, taking off 3 weeks prior to the Bar exam in order to study. That request made me very upset and I explained to him how unfair this already was to our other attorneys carrying his expected work load and how it would now be much more unfair since he would be providing absolutely NO assistance to them concerning the cases he was now only assisting them with. I made it clear that I was NOT in favor of granting his request but I would give it some more thought. As I recall I gave it no more thought.

I think around July 9 he came to me to discuss some research he was doing for Jodi Spiegel on her upcoming murder trial. He seems to have an unreasonable emphasis on "intent" in criminal matters and nearly all his research seems to concentrate on "intent" or lack thereof. In any event, although there did not appear to be any lack of intent in the circumstances, I could not get him to address the intent issues in any reasonable fashion. I became upset and angry at his lack of response as to my question concerning intent and he stood up, made some comment that I don't specifically recall, and walked out of my office. After a few moments I went to his office, very unhappy, and addressed his actions. Soon thereafter I asked him back to my office, apologized for my anger and stated that it was inappropriate. Notwithstanding my apology I also informed him that should he ever do that again he should just keep on walking out of this office and not consider returning.

We then had a further discussion of the initial intent issue, he brought in some other communications with Jodi and it did appear that there may exist a prior circumstance between our client and the victim that might be admissible in evidence concerning intent. It then appeared clear, through his comments, that he was completely unaware of that prior circumstance; that he was unaware of the fact situation that I thought he was researching; and was just on some kind of blind search for an intent issue. All of which I explained to him and emphasized that he seemed to have this obsession with "intent" in every

Exhibit C-2

circumstance and "intent" was rarely a critical issue. He also advised that Todd Dawson had previously told him something very similar. In any event, that ended our conversation and problem.

On July 12th I had a CT scan in Gainesville and returned to the office I'm guessing around 9:30 or 10:00. As soon as I got to the office I received a phone call from my Dr. that the radiologist had reviewed my CT scan; I had cancer; the tumor was pushing against my vocal cords; was constricting a vein which caused a blood clot; my health/life was in serious danger; and I needed to immediately go to the Emergency Room at NEGaMedCtr for tests and treatment.

I immediately found all my present staff in the office and in the courtroom, (including Javier); told them of my circumstances; and Janet Ash took me to the Emergency Room.

Janet, Saturday, July 13, 2019

I will drive down this weekend. Also will have Javier leave of absence form. Did you authorize Jodi to approve that? Me – I have not approved that leave yet. I'm still considering it. I lean against it and need to talk with Javier again about it. We hired with the expectation of passing. Not passing has greatly increased the caseload for Penny, Amy and Wil. And if anything is unfair then that is. Janet – Javier went to Jodi and she approved. What do I do? We can talk in person later if u want. Just let me know what to do with Javier. Me – This interests me greatly. One thing, in particular, is Javier's leave approval. At this point I've been out less than a day. Janet – He took it upon himself to go to Jodi ...... she has taken it upon herself to make decisions.

Janet, Sunday, July 14, 2019

Me – Janet, I just sent the following to Javier so I'm leaving him with the decision. I'll have to live with it.

Me – Javier, at this point I'm not sure what to expect as a time frame. I did want to discuss this leave matter with you but it does not appear likely. I'll try to explain, very briefly my concerns. When we hired you we certainly expected that you would pass the bar since you graduated from a very reputable law school and we had never had an early hire who did not pass on the first opportunity. A major concern is I had the expectation that you would, soon after hire, being carrying a substantial caseload which is now being carried by 3 of our lawyers. They had a substantially, (very substantially) higher than our attorneys across the mountain. Now they must continue with that much greater caseload for a substantially greater time. Also, although they are VERY good, they are grossly underpaid. I don't feel that this is fair to them under any circumstance, and particularly eliminating your assistance to them in order to study for the bar. In any event, it is entirely your decision. If you wish to take time off then do it. Although I have great concern in explaining this situation to our other lawyers, I'll leave your decision entirely up to you. I'm copying Janet with this text so she will be aware. Whatever your decision, I certainly wish you the best fortune in studying and passing the bar exam.

Some clarification

It appears that Jodi was very uncomfortable about granting Javier leave in my absence, and I have some reason to believe that Javier, maybe entirely innocently, miscommunicated his/my understanding of this leave situation to Jodi. I cast no blame on Jodi due to my emergency situation, and her being thrust in to that situation.

Exhibit C-3

Also, to summarize, my primary concern and purpose in this writing is to basically set forth 3 issues that concern me: 1) Javier's failure to pass the bar and his actions concerning taking a leave of absence to study for the bar; 2) Javier's disrespect in walking out of my office; and 3) Javier's apparent failure to properly define and appropriately address the research he was asked to perform.

I intend that Javier be aware, in no uncertain terms, that these actions are unacceptable and will not be tolerated.

Exhibit D-1

**Jimmonique R.S. Rodgers**

| | |
|---|---|
| **From:** | Jimmonique R.S. Rodgers |
| **Sent:** | Wednesday, July 31, 2019 9:16 AM |
| **To:** | Charles Brown; Maryellen Simmons |
| **Subject:** | Re: How are things going |

Good morning Charlie. We want you to know that we are here to support you personally and professionally through this treatment.

Larry will reach out to you with Janet, so that you can communicate the initial timeline for making a plan with him. Additionally, Nicki Vaughan is available to assist with juvenile court proceedings to alleviate some of the workload there if you need her.

Have you made a decision about the candidate that you were interviewing? We want to make sure we circulate this posting to a wider audience as soon as possible.

Jimmonique

> **From:** "Charles B. Brown" <cbbrown@gapublicdefender.org>
> **Date:** July 30, 2019 at 10:01:45 AM EDT
> **To:** "Maryellen Simmons" <msimmons@gapublicdefender.org>
> **Cc:** "Rodgers, Jimmonique" <jrodgers@gpdsc.org>
> **Subject: Re: How are things going**
>
> Maryellen: I would prefer to talk but I'm afraid I'm not very reliable at the moment and I had to constantly interfere with Janet's work to be my interpreter/mouthpiece. She's really dedicated and reliable but I feel I ask too much of her. So, at least for the time being, I suppose writing is the best solution. First, I do want you and Jimmonique to know how very much I appreciate your leadership and assistance during this somewhat difficult time for me. My medical situation is very similar to the previous one 14 years ago,
> (████████████████████████████████████████), however there are some complication existing this time that did not exist last time. These complications are somewhat related to my treatments for
> ████████████████████████████████████████████
> ████████████████████████████████████████████
> ████████████████████████████████████████████he
> ████████████████████████████████████████████
> ████████████████████████████████████████████
> ████████████████████████████████████████████
> ████████████████████████████████████████████e
> █████████████.
>
> Jodi just started a White County murder case and she has ample assistance from our legal staff, particularly Penny, and both of our outstanding investigators. She expects to also try a Lumpkin County murder at the end of August, with similar

1

Exhibit D -2

assistance, but we'll see. The State may want it continued. After the trial this week, that will leave us with a total of 2 murder trials currently remaining. Depending on my progress, I may be available for 1 or both of those trials but I certainly don't intend to depend on it, and I think Larry Duttweiler would provide a very good alternative. He has always been extremely helpful when we've had a common defendant in our 2 circuits and actually offered to try that defendant's case in our circuit. Also, I've always had a very good relationship with Brad Morris and I would not expect any problems there. Also, I have GREAT confidence in the abilities of Penny and Wil, (apparently greater than their self confidence), but both are considerably overworked and underpaid. I'll need to review our files on the other 7 deadly cases and let you know ASAP. Although it is not definite in my mind, I expect Javier, (who is currently an assistant), is taking the Bar exam for the 2nd time today and tomorrow, will be our Juvenile designated attorney should he pass the Bar, and who will, unfortunately, be dismissed should he again not pass. We are currently looking at another attorney, (we don't know yet if he accepts), who will come in at a State position, Jodi's, or a circuit position, or possibly begin as one and be transferred to the other),

Money may be a very different issue. We have 4 different county commissions to deal with as a group and, confidentially, one of them has been somewhat difficult to work with and, seems to me, has a decided favor toward the DA's office. However, we receive a separate, individual allotment of $20,000.00 from Union County and I believe I can provide some income supplementation from that source even if I can't use the refund amount.

In any event, again, I greatly appreciate your and Jimmonique's continued interest and support.


Charles B. Brown

Enotah Judicial Circuit Public Defender

59 South Main Street, Suite C

Cleveland, Georgia 30528

(706) 348-8577

(706) 348-8578 - Fax


-----Original Message-----
From: "Maryellen Simmons" <msimmons@gapublicdefender.org>
To: cbbrown <cbbrown@gapublicdefender.org>
Date: 07/29/19 10:57 am
Subject: How are things going

Charlie:
I know that you have difficulty talking on a phone, so I thought I would reach out to you this way. Jimmonique and I were talking about things we can do to help you. I know you

2

Exhibit D-3

are down a juvenile attorney and that Jodi is getting ready to leave the end of the month. I believe Jimmonique talked to you last week about getting Larry Duttweiller from Hall County to come help with the more serious cases. In talking with Penny last week she did not feel that she or Will could first chair a seven deadly case. If you could please get me a schedule of upcoming trial dates and a list of pending serious cases we can try to put together a plan.

Also, I understand you have interviews for your open position. Is this for the open juvenile position or for something else? We were going to try to re-do your posting for Jodi's position in hopes of attracting more experienced attorneys.

As far as pay raises, Jason is supposed to be looking at your refund that will be due to your counties. If there is money there do you think the counties might let you use it towards a pay increase, with the understanding they will have to financially cover it in next years budget moving forward? Or can you use it for one time bonuses if they are not willing to fund a salary increase?

I know this is a lot. If you would rather talk by phone just let me know. But I do think we need to get working on these issues soon. My cellphone number is (770)328-8559.

Thanks,

--

**Maryellen Simmons**
*Circuit Public Defender*

[×]

Office of the Public Defender
Coweta Judicial Circuit Carroll County Office
306 Tanner Street
Carrollton, Georgia 30117

T: 770.830.1323
F: 770.830.0715
E: msimmons@gapublicdefender.org

---------------------------------

3

12/1/2019

 Gmail - Public Records Request



Javier Benavides <jabeluna@gmail.com>

## Public Records Request

**Cheryl Karounos** <ckarounos@gapubdef.org>
To: Javier Benavides <jabeluna@gmail.com>
Cc: "openrecords@gapublicdefender.org" <openrecords@gapublicdefender.org>

Tue, Sep 3, 2019 at 4:42 PM

Here is the responsive information to your request.

Open Records - Javier Benavides Request for Paralegal Ivs

| Eff Date | Name | Reason | Short Desc | Ethnic Grp | Job Code Desc | Service Dt |
|----------|------|--------|------------|------------|---------------|------------|
| 6/17/2019 | Kolbo,Thayer James | APP | Appt | WHITE | Paralegal 4 | 6/17/2019 |
| 5/16/2019 | Benavides,Javier Rafeal | APP | Appt | HISPA | Paralegal 4 | 5/16/2019 |
| 7/1/2019 | Moye,Sharon | PRO | PromoSame | BLACK | Paralegal 4 | 8/16/2018 |

Thank you.

[Quoted text hidden]

Exhibit F-1



**GEORGIA PUBLIC DEFENDER COUNCIL**

**Office of the Public Defender**
**Enotah Judicial Circuit**
59 South Main Street, Suite C, Cleveland, GA 30528
Phone: 706-348-8577 Fax: 706-348-8578

**Charles B. Brown**
*Circuit Public Defender*

WHITE COUNTY

August 1, 2019

Javier Benavides
White County Public Defender's Office
59 S. Main St., Suite C
Cleveland, GA 30528

VIA HAND DELIVERY

Re:     Notice of Termination, at will employee, as Paralegal 4 from the Office of the Enotah Judicial Circuit
        Public Defender

Dear Javier:

        It is with regret that I hereby notify you of your termination as Paralegal 4 from the Office of the Enotah
Public Defender effectively immediately.  Your past service to the office is sincerely appreciated and we wish
you the best of luck in the future.

        Please remove all your personal belongings as soon as possible and be sure that all Public Defender
property, including office keys, are returned to or left in the office.

        Please complete all reporting forms for reimbursable expenses and leave on a timely basis.

        With kind regards, I remain

        Sincerely yours,

        Charles B. Brown

Exhibit F-2

**GEORGIA PUBLIC DEFENDER COUNCIL**
**PERSONNEL ACTION FORM**
SUBMIT TO: HR-REQUEST@GAPUBLICDEFENDER.ORG

GEORGIA PUBLIC DEFENDER COUNCIL

| Circuit / Office | ENOTAH CIRCUIT | | | Today's Date | 8/1/2019 |
|---|---|---|---|---|---|
| Type of Funds | ☐ State ☑ Local | Position # | | Supervisor Position # | |
| Department #. | 402034- | Job Code | | Fund Code # | |
| Supervisor Name | HARLES B. BROW | Employee ID# | | Social Security # | |

| Name | BENAVIDES | JAVIER | R. |
|---|---|---|---|
| | Last | First | Middle |

| Address | |
|---|---|
| | City     State     Zip     County |

**TYPE OF ACTION**

| Effective Date of Action | 8/1/2019 | | | | |
|---|---|---|---|---|---|
| New Employee (Full Time)* | | | Regular | ☑ | Promotion |
| New Employee (Part Time) | | | Temporary | | Salary Change |
| Employee Transfer* | | | Seasonal | | Termination / Retirement / Resignation / Dismissal* ☑ *Attach Justification |
| Other | | ☑ | Time Limited | | |

*Is employee transferring from or to a different Circuit/Office **OR** from or to another State Agency?   Yes ☑ No

**TITLE / SALARY INFORMATION**
**CURRENT**

| Position Title | PARALEGAL 4 | Pay Grade/Step | |
|---|---|---|---|
| Annual Salary | $46,443.00 | Semi Monthly Salary | |
| Comments: | | Funding Source | |

**TITLE / SALARY INFORMATION**
**CHANGE TO**

| Position Title | | Pay Grade/Step | |
|---|---|---|---|
| Annual Salary | | Semi Monthly Salary | |
| Comments: | | Funding Source | |

CIRCUIT PUBLIC DEFENDER OR OFFICE HEAD          DATE  8-1-19

HUMAN RESOURCES MANAGER          DATE

EXECUTIVE DIRECTOR          DATE

For attorney positions please indicate whether employee is in good standing with the Georgia Bar or date for taking Bar Exam

_____ Bar Number _____

I understand I am responsible for ensuring this employee meets or exceeds all qualifications and actually works according to the type of action specified above.

# Exhibit G

 GEORGIA
PUBLIC
DEFENDER
COUNCIL

**Leave Without Pay Request**

☑ Initial Request  ☐ Extension Request

| EMPLOYEE INFORMATION | | |
|---|---|---|
| Employee's Name: Javier Benavides | | Employee ID #: ▓▓▓▓ |
| Office/Circuit: Enotah Circuit / Cleveland, GA | | |

| LEAVE WITHOUT PAY REQUEST | | |
|---|---|---|
| Projected Absence: | Begin Date: 7/15/19 | End Date: 7/31/19 |

I am requesting previously approved leave be extended through:

Reason for Leave:

☐ Illness or Serious Injury (Medical documentation attached)
  ☐ Employee's Serious Health Condition
  ☐ Spouse's Serious Health Condition
  ☐ Child's Serious Health Condition -- Chlc's Age: _____
  ☐ Parent's Serious Health Condition
  ☐ Birth of a Child, or Placement of a Child with you for Adoption or Foster Care:
    Date of Placement/Birth: _____

☐ School
☐ Child Care
☑ Other (please specify) State Bar prep at home

*Javier has some annual leave and education leave that can be used. I think he has 20 annual hours 8 education hours*

I understand that if my authorized leave without pay request is denied, I may be approved for contingent leave without pay and my return to duty is subject to a suitable position being available.

Employee's Signature [signature]   Date: 7/16/2019

| MANAGEMENT APPROVAL SECTION | | |
|---|---|---|

**GENERAL GUIDELINES:** *(See GPDC 3.7, Leave Without Pay and Furlough for full guidelines)*
- Approving manager should consult with the Human Resources Office regarding the terms and conditions for an approval of a contingent leave without pay request
- Manager will consider reason for request, attendance/punctuality history, and nature and volume of workload when considering request
- All requests must be responded to in writing, with a copy of the notice forwarded to the Human Resources Office.

☐ Approve  ☐ Deny Authorized Leave
☐ Approve  ☐ Deny Contingent Leave

Supervisor's Signature _____  Date: _____

☐ Approve  ☐ Deny Authorized Leave
☑ Approve  ☐ Deny Contingent Leave

CPO or Office Head's Signature [signature]  Date: 7-16-19

5/17   Page 1 of 1   Policy 3.7, Attachment A

Exhibit H-1

To: "Javier Benavides" <jbenavides@gapublicdefender.org>
Date: 07/10/19 11:39 am
Subject: Re[5]: Pate

Hi Javier,

Thank you for your great research.  But, I do NOT think we ████████████ in
GA. ████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████

Jodi Spiegel
Chief Assistant Public Defender
Enotah Judicial Circuit
65 Courthouse Street
Suite 265
Blairsville, GA 30512
706-745-8156
706-745-8166 (fax)

-----Original Message-----
From: "Javier Benavides" <jbenavides@gapublicdefender.org>
To: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
Date: 07/10/19 07:13 am
Subject: Re[4]: Pate

Good morning Jodi,

Sorry I didn't get back with you yesterday.  Please find attached ████████████
████████████████████████████████████████████████

-----Original Message-----
From: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
To: "Javier Benavides" <jbenavides@gapublicdefender.org>
Date: 07/09/19 04:13 pm
Subject: Re[3]: Pate

████████████████████████████████████████████████████████████
████████████████████████████

Jodi Spiegel
Chief Assistant Public Defender
Enotah Judicial Circuit
65 Courthouse Street
Suite 265
Blairsville, GA 30512
706-745-8156
706-745-8166 (fax)

-----Original Message-----
From: "Javier Benavides" <jbenavides@gapublicdefender.org>
To: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
Date: 07/09/19 01:44 pm
Subject: Re[2]: Pate

3

Exhibit H - 2

-----Original Message-----
From: "Javier Benavides" <jbenavides@gapublicdefender.org>
To: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
Date: 07/10/19 02:27 pm
Subject: Re: Re[9]: Pate

Yes ma'am!

Sent from my iPhone

> On Jul 10, 2019, at 12:58 PM, Jodi Spiegel <jspiegel@gapublicdefender.org> wrote:
>
>
> Thank you for helping out!! ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
>
>
>
>
> Jodi Spiegel
> Chief Assistant Public Defender
> Enotah Judicial Circuit
> 65 Courthouse Street
> Suite 265
> Blairsville, GA 30512
> 706-745-8156
> 706-745-8166 (fax)
>
> -----Original Message-----
> From: "Javier Benavides" <jbenavides@gapublicdefender.org>
> To: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
> Date: 07/10/19 12:56 pm
> Subject: Re[8]: Pate
>
> Thank you for giving me the opportunity to help out!!!
>
>
>
>
>
> -----Original Message-----
> From: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
> To: "Javier Benavides" <jbenavides@gapublicdefender.org>
> Date: 07/10/19 12:53 pm
> Subject: Re[7]: Pate
>
> Got it, thank you, learn something new every day. Never heard it called ▇▇▇▇▇▇▇▇
>
>
>
>
> Jodi Spiegel
> Chief Assistant Public Defender

2

Exhibit H-3

To: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
Date: 07/10/19 03:12 pm
Subject: Re[10]: Pate

Sorry Jodi it took me a while.  Please find attached two files with information regarding

Javier

-----Original Message-----
From: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
To: "Javier Benavides" <jbenavides@gapublicdefender.org>
Date: 07/10/19 12:58 pm
Subject: Re[9]: Pate

Thank you for helping out!!

Jodi Spiegel
Chief Assistant Public Defender
Enotah Judicial Circuit
65 Courthouse Street
Suite 265
Blairsville, GA 30512
706-745-8156
706-745-8166 (fax)

-----Original Message-----
From: "Javier Benavides" <jbenavides@gapublicdefender.org>
To: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
Date: 07/10/19 12:56 pm
Subject: Re[8]: Pate

Thank you for giving me the opportunity to help out!!!

-----Original Message-----
From: "Jodi Spiegel" <jspiegel@gapublicdefender.org>
To: "Javier Benavides" <jbenavides@gapublicdefender.org>
Date: 07/10/19 12:53 pm
Subject: Re[7]: Pate

Got it, thank you, learn something new every day. Never heard it called

Jodi Spiegel
Chief Assistant Public Defender
Enotah Judicial Circuit
65 Courthouse Street
Suite 265
Blairsville, GA 30512
706-745-8156
706-745-8166 (fax)

2

# Exhibit I

**Melanie Johnson-Devlin**

| | |
|---|---|
| **From:** | Javier Benavides <jabeluna@gmail.com> |
| **Sent:** | Thursday, August 1, 2019 1:34 PM |
| **To:** | Melanie Johnson-Devlin |
| **Subject:** | Re: Exit form the Enotah Circuit |

Is that the decision of the Public Defender's Council?

Best regards,

Javier Benavides

On Thu, Aug 1, 2019 at 1:31 PM Melanie Johnson-Devlin <MJohnson-Devlin@gapubdef.org> wrote:

Good Afternoon Javier,

Per our earlier conversation, Charles Brown has the authority to appoint and terminate employees in the Enotah Circuit.

Thanks,

-Melanie-

 GEORGIA PUBLIC DEFENDER COUNCIL

**Melanie Johnson-Devlin, SPHR, SHRM-SCP**

Human Resources Manager GA Public Defender Council

Human Resources Department

p: 404-795-2438  c: 470-747-2293 f: 404-795-2498

a: 104 Marietta Street Suite 400 Atlanta, GA 30303

w: www.gapubdef.org e: mjohnson-devlin@gapubdef.org

*"The moral arc of the universe bends at the elbow of justice."*

-Dr. Martin Luther King, Jr.

Exhibit I -1

*Office of Public Defender*

*59 South Main Street*

*Suite C*

*Cleveland, Georgia 30528*

*706-348-8577 (Phone)*

*706-348-8578 (Fax)*

-----Original Message-----
From: "Javier Benavides" <jabeluna@gmail.com>
To: "Janet B. Ash" <jash@gapublicdefender.org>
Date: 07/13/19 12:04 pm
Subject: Re: Re[3]: Leave

I need from July 15th through July 31st.

I apologize for taking it upon myself to ask Jodi. Please let him know that I asked Todd before asking Jodi.

At the time, based on Charlie's message, I reasonably thought that he had stepped aside momentarily to handle his health issues. Todd told me to ask Jodi since is the second one in command.

I hope he doesn't think that I'm trying to go over his head by doing so.

Thank you,

Javier

On Sat, Jul 13, 2019 at 11:57 AM Janet B. Ash <jash@gapublicdefender.org> wrote:
I will see Charlie this weekend with a lot of office stuff to go over. What time frame are you requesting and I will talk to him.

*Janet Ash*

*Enotah Judicial Circuit*

*Office of Public Defender*

*59 South Main Street*

*Suite C*

*Cleveland, Georgia 30528*

*706-348-8577 (Phone)*

2

## Exhibit I·2

*706-348-8578 (Fax)*

-----Original Message-----
From: "Janet B. Ash" <jash@gapublicdefender.org>
To: "Javier Benavides" <jabeluna@gmail.com>
Date: 07/13/19 10:39 am
Subject: Re[2]: Leave

I just spoke to Charlie, He has not approved the leaveyet and Jodi does not have the authority to approve. I have let him know what is going on and waiting for his direction.


*Janet Ash*

*Enotah Judicial Circuit*

*Office of Public Defender*

*59 South Main Street*

*Suite C*

*Cleveland, Georgia 30528*

*706-348-8577 (Phone)*

*706-348-8578 (Fax)*


-----Original Message-----
From: "Javier Benavides" <jabeluna@gmail.com>
To: "Janet B. Ash" <jash@gapublicdefender.org>
Cc: "Javier Benavides" <jbenavides@gapublicdefender.org>
Date: 07/13/19 10:35 am
Subject: Re: Leave

Janet,

I'm pretty sure Charlie didn't authorize Jodi. However, I sent an email to him before we found ███████████. He hasn't returned the email yet. What do you suggest I should do?

Taking the time off now it's crucial for me. I have now enough time to prepare and being successful. Less time would reduce my chances significantly.

Javier

On Sat, Jul 13, 2019 at 10:27 AM Janet B. Ash <jash@gapublicdefender.org> wrote:
You will need to talk to HR. I will send you the email of the girl that might be able to address this. There is a form Charlie will have to sign. We can do the form Monday I guess

3

## Exhibit I-3

unless you can give me the specifics of the time frame. Did Charlie authorize Jodi to approve that?

Janet Ash

Enotah Judicial Circuit

Office of Public Defender

59 South Main Street

Suite C

Cleveland, Georgia 30528

706-348-8577 (Phone)

706-348-8578 (Fax)

-----Original Message-----
From: "Javier Benavides" <jbenavides@gapublicdefender.org>
To: "Janet B. Ash" <jash@gapublicdefender.org>
Date: 07/12/19 02:47 pm
Subject: Leave

Janet,

I spoke with Jodi about the time I have to take off and she authorize me to take two weeks and a half. This would be until July 31. I will be back on August 1. However, I don't know what it would happen with my insurance. II tried to speak with Atlanta but it's impossible to speak with anyone. Can you please get the information for me?

Javier

--
Javier R Benavides

--
Javier R Benavides

--
Javier R Benavides

4